2040 American Premier Underwriters v. General Electric. Arguments not to exceed 15 minutes per side. Mr. Tamulonis for appellant. Good afternoon. Good afternoon, Your Honors. May it please the Court, my name is Frank Tamulonis and I represent the appellant American Premier Underwriters. In this case, I'm joined at council table by Mr. Tom Stewart and I'll be requesting two minutes on rebuttal today. The Comprehensive Environmental Response, Compensation, and Liability Act is the federal statute that was designed to ensure that the costs associated with cleaning up contamination are borne by those who are responsible for the contamination. Consistent with this intent, APU brought this lawsuit seeking to recover tens of millions of dollars that it spent in order to clean up contamination. In this case, however, GE is seeking to absolve itself of all responsibility, notwithstanding a robust record which clearly demonstrates that GE designed the transformers to discharge PCBs in their normal course of operation. That GE maintained control over the transformers even after they were sold and put into operation. That GE failed to mitigate the discharges even with knowledge and awareness that the discharges were occurring. And that GE agreed to a broad indemnity intended to benefit APU's predecessor, Penn Central, against any and all claims associated with the transformers. So why don't we start with the arranger language and Burlington Northern's interpretation of it, which is pretty text-based. Arrange is, I think, a tough word here. Arrange is, I think, a tough word here. Arrange is, I think, a tough word here. It's correct that it certainly served a useful purpose when it was placed into the transformer, but there's also no question that once it was discharged, it became a waste. And I go back to the language of Burlington Northern, which says that the intent must be to dispose of at least a portion of the product. It doesn't say waste, it says product. It doesn't say waste as opposed to knowledge. I would say it's more accurate to characterize that as knowledge. Because they didn't desire it to be released, they had knowledge that it might happen. They had knowledge that it might happen, and then they had knowledge, in fact, that it did happen. And that's what makes this case distinguishable from a lot of the other arranger liability cases that GE relies on. It's what GE did and didn't do after it gained knowledge and awareness of the discharges. What are the cases on your side for your view of arranger? I think I would point to a couple different cases, both in this circuit and in other circuits. First, out of this circuit, I would point to the seal of oil products case, which held that it sort of took a more realistic approach to the useful product exception. And it realized the reality that products and programs frequently do have multiple purposes. They can be useful on one hand, but they can also serve a further purpose of creating a discharge. But that was pre Burlington Northern, right? It was, but that remained untouched even after Burlington Northern. That concept that you can serve a further purpose and you need not be restricted to a singular purpose survived Burlington Northern. That was not addressed by the court in Burlington Northern. I would also direct the court to United States v. Washington Department of Transportation, which is another case that found the product at issue there was a storm water retention basin. And it had the intent of collecting storm water, but it had... Weren't those whatever they were, structures, I guess, weren't they designed to discharge waste? I mean, they were designed to move undesirable rainwater, whatever it was, out. I mean, that seems to be different than... They were designed to discharge storm water, that's correct. They were not designed to gather pollutants and discharge pollutants. It was sort of an unintended but secondary effect. And under that case, the court held that arranger liability did apply. So if the court were to adopt GE's interpretation, which is essentially a per se rule, that says that if there's any useful purpose, then arranger liability mustn't attach. That would dramatically expand the useful product exemption because it would in essence allow manufacturers to design a product to discharge with impunity. And without any sort of mitigating measures or a collection bucket or any sort of safeguards. And it could avoid arranger liability, essentially creating a liability loophole in CERCLA that would eviscerate the underlying intent of CERCLA, which is to ensure that the cost of addressing those discharges are borne by those who are responsible for the discharges. But I guess I'm not understanding how under what you're proposing, wouldn't Burlington Northern itself have come out the other way? No. Can you distinguish the facts there from this case? There's two critical distinctions. The first is that the spills there were sort of minor and accidental spills is how the court described them. But even more to the point is that if you look at what Shell did... Can I just stop you there? Why weren't these minor and accidental? Because I believe the facts show that they were widespread. They had occurred for years. Was each time it quote burps? Isn't that pretty minor? No. A burp could be up to 15 gallons at a time. That's well established in the record that a single burp could discharge 15 gallons of PCBs. How often did that happen in the record? Off the top of my mind, I'm not exactly sure how often that happened, but the PCB contamination was widespread and it happened over a number of years. These were not minor and accidental spills as was at the issue in Burlington Northern. The second point is what Shell did in response to gaining knowledge that the spills were occurring. Shell undertook multiple mitigating steps to ensure that they did not continue to occur. What GE did here is they undertook two measures, both of which had the opposite effect. They actually had the effect of ensuring that the discharges would continue. The first step was that they adopted the fail and fix policy, which was over the protests of the railroads who desired a more proactive approach. They wanted to recall the transformers after they started failing at a high rate and have them repaired. What GE did is they enacted fail and fix. This was a policy that allowed the transformers to fail, discharge pyranol in some instances, discharge up to 15 gallons of pyranol in some instances. This was apparently an economic decision. It was a cost saving measure. GE made the decision not to recall, but rather to let them fail and fix. It was also a policy that was enacted without any regard to the environmental consequences. The second issue is that GE actually did redesign the transformers, but they did so by fitting it with a shroud. Unlike other, you might expect that it would capture the PCBs, but it had the opposite effect. It was actually intended to direct the PCBs directly into the environment. The issue here is, unlike other arranger reliability cases, where it might have required an end of use release, where there was some residual hazardous substance at the end of its useful life, or that it required perhaps an accident or some sort of negligence or some intervening act, that was not the case here. It required no intervening act on behalf of the operator. If it discharged pyranol, it was doing so to protect the transformer, maintain the pressures, it was operating exactly as designed, and from day one when they were put into operation, that's how they were designed to operate. So when I read Burlington Northern, I read it as a case that's just very text-based, and they're just saying, listen, it's arranged for disposal of hazardous substances. So that's just, it's a very strange way to characterize what happened here. Arranged for disposal of hazardous substances, that's just not what you think of when you think of these facts. And that's how I read Burlington Northern, just say, listen, if you want to try operator liability, go for it, but arranger means arrange, and that's not what, this is, your theory is a strict liability. You were doing something and, or not strict liability, but I guess a little bit of knowledge, I think essentially a negligence theory. You're stuck if in the process of, you know, using a product, selling a product, I don't think spills out, you're in trouble if you know about it. I'm happy to move on to operator liability, Your Honor, and I would just close on arranger liability, that I would suggest that the facts clearly do depict an arrangement. They show that GE planned that the PCBs would be discharged through the pressure release device, and then they took further intentional steps to ensure that those discharges continued. That is an arrangement. On operator liability, in contrast to arranger liability, the issue there is whether GE exhibited sufficient control over its transformers, and it's based on a totality of the circumstances standard. Now, our briefing provides an abundance of evidence in the form of documents and deposition testimony that shows that there was a high level of control maintained by GE, even after the products were sold. Just a couple points that I would just like to highlight, and the first is design, because courts in this circuit and in other circuits have found that design is one indicia of control that can be used to find operator liability, and here there was obviously one entity that had control over the design. That was GE. But beyond that, the record here shows that GE maintained a pervasive level of control over the transformers, even after they were sold to APU, and just a couple points I'd like to highlight. One is that GE's own field engineer, Albert Keefe, testified that GE employees provided quote, day-to-day technical assistance and training regarding the transformer maintenance. GE employee, Lauren McMonagle, further testified that it was GE's responsibility to address transformer failures and leaks of Pyrenol, not the railroad workers, and if you look at contemporary documents at the time they drive the point home, they state that they want the GE, this is a GE document stating that GE field engineers and not railroad employees should quote, take the lead role, end quote, in maintaining and repairing the transformers, and further threatened the railroads, that if they became too involved, it would have the effect of voiding the warranty. So these facts viewed under totality of the circumstances show that GE maintained exclusive control over the design, and then pervasive control over the repair. Are there any facts in dispute? I believe that the facts are well borne out in the record. I think what happened in the district court is they didn't look at all of the facts on the record, they looked at some of the... Is this the issue that went to trial? On trial briefs, yeah, on the papers, that's correct. So it was tried with submission of evidence, right? There was no trial, right? Correct, that's correct. So what is our standard of review? Is it de novo? Under normal circumstances, if this was on summary judgment, certainly it would be de novo. This is a little bit of a different... So there are facts disputes, or there are fact disputes? I don't think that there's any real fact disputes. I think the problem is that you need to look at all the facts. So it's just what's material. It's a materiality dispute, not a fact dispute. But the district court takes all of the evidence and does a totality of the circumstances analysis and says, GE is not an operator, and we review that... I believe for clear error. I think you could find that there were several clear errors that happened. One is they did not look at the totality of the circumstances, so they used the wrong standard. They didn't look at all the facts and make a decision. They sort of said, well, let's look at the design. Design is not enough, so we'll put that aside, and they siloed all these different facts out. They also looked at certain facts, but not all the facts, and it did not paint a really clear picture of the level of control that GE... But when you say the district court didn't look at all the facts, you're just saying that the district court didn't, say, now you say, well, the district court didn't consider E, but we don't know if the district court considered E. It doesn't necessarily have to say, I also considered E, does it? To put it more fairly, I would say the district court considered A and B, but it did not consider C through Z, because there's a much broader picture, a much bigger picture. But the only reason, and we know that because they were just not mentioned in an opinion? Right, there was no mention of it in the analysis portion of the opinion when they were deciding whether or not there was sufficient control. They mentioned the testimony of certain individuals at deposition, but they failed to acknowledge other documents. And by the way, APU does not dispute the evidence that was acknowledged. Certainly the evidence shows that GE was providing advice, and that's absolutely true. GE did provide advice, but it's a woefully incomplete picture. There's a substantial amount of evidence that shows that GE had a much higher level of control over the day-to-day functioning of the transformers. And the district court, in addition to not looking at the totality of the circumstances on that issue, just failed to acknowledge those facts within its analysis. So those are two bases. Is it relevant whether someone's characterized as independent contract or joint venture, all that stuff? Is that not really the way to think about it? Like it could be a sufficient explanation, but not necessary, or what do you do with that? I don't follow the independent contractor question, Your Honor. Well, I'm just wondering if there's corporate law concepts that inform this, or if it's just pure fact, it's just a function of what exactly they do. It didn't matter exactly what the relationship was between GE and the railroad. Who cares what they called it, whether they called it independent contractor or not, or does it actually make a difference how they were characterized? That doesn't really, that's not really probative to this question. It's really a factual determination of whether the control exertor rises to the level of control needed under the best food standard, which is control over the operations that are dealing with pollution. And our argument is that based on the facts, there's more than sufficient control. And I would refer the courts to, and we mention it in our briefs, but the New West decision, its GenCorp decision, and the ExxonMobil decision, all of which have sufficient control. But they have similar fact patterns to the level of control, which as I said, the facts demonstrate was pervasive. And the courts in those instances found that operator liability attaches. So what we're asking this court to do is to take the totality of the circumstances and review the facts through that lens. Okay, thank you. You'll get your full rebuttal. Mr. Shaughnessy. Good afternoon, may it please the court. Robert Shaughnessy for Applee General Electric Company. The district court in this case made numerous rulings on numerous issues en route to finally entering judgment for GE. But this court can resolve this appeal by deciding just two issues. First, that GE is not a covered person subject to circular liability as either an arranger or an operator. And second, that the plain language of the indemnity provisions in the 1971 car building contracts simply don't apply to the sorts of liabilities that APU asserts here. Namely, liabilities arising from transformer leaks that occurred in the normal operation of the rail cars by the railroads. Let me turn to arranger liability first, if I may. No question, Burlington Northern imposes a requirement to the defendant act with a purpose or plan or maybe for shorthand, a specific intent to dispose of hazardous waste. Not an intent to do the act, but an intent to accomplish the goal. And I think that's where APU's argument runs off the rails, if you'll excuse the pun. Because certainly General Electric intended to put a pressure relief device on the transformers. For one thing, it was required by the railroad. It's absolutely standard in equipment of this type. Everybody does it. It would be incredibly unsafe not to do it. But the more standard and customary, the more obvious that it's going to happen. Well, the placement of pressure relief valves is standard. Their actuation is by no means common. And I can invite the court to some record materials that addresses that. These pressure relief ventings were not everyday occurrences. They were more like once a month. That sounds more often than in Burlington Northern. Well, no, the record there was that every delivery of the pesticide involved spills. How about the quantity there and here? They were minor spills at every time of delivery in Burlington Northern, but it was over a period of decades. So the aggregate amount may well have been large. And I don't think anything in the Supreme Court's reasoning turned on the quantity. You know, half a pound is okay, but 50 gallons is not okay. The lodestar is the defendant's state of mind. And the most that can be said here is that GE at various points knew that releases of the fluid had occurred in the past and foreseeably would occur at some unknown frequency in the future. But no more than that, and under Burlington Northern, that is insufficient for arranger liability. Now, notably, there are no what we might call plus factors here that could plausibly suggest in conjunction with the evidence of GE's knowledge that GE in fact harbored mixed motives, one of which was to get rid of the pyrenol. For instance, there's no evidence that getting rid of the pyrenol per se conferred any economic advantage on GE. Quite the opposite, if a unit failed and it was under warranty, fixing the problem was on GE's dime. So there was an affirmative economic detriment. As for GE's refusal to recall the transformers and fix them, GE was simply enforcing the deal it had with SEPTA, which provided that GE had no obligation to recall the entire fleet to replace components unless 25% of that instance of components had failed, and there's no evidence in the record that the transformer failures ever got to that level. So GE was entirely within its rights in enforcing the agreement with SEPTA as it was written. Nor is there any evidence here, as there has been in some of the cases that have found arranger liability, of subterfuge by GE. GE was candid and straightforward with Penn Central and the other railroads that the transformer fluid contained PCBs and that all necessary precautions should be taken to prevent or minimize the entry of the material into the environment. That is totally inconsistent with an inference that GE wanted the stuff to get into the environment. Very parallel with similar facts in Burlington Northern, where Shell over the years took steps and gave advice to the distributor about how to minimize the spills. Finally, no one, not on GE's side, not on the railroad side, was happy with these releases. As APU points out in its brief, internal GE documents remark about this being a negative occurrence. It's not something GE wanted to happen, just as it wasn't anything that the railroads wanted to happen, and it was a source of considerable friction with the railroad customers. Did GE provide the pyranol periodically? I assume the transformer would need to be refilled or something at some point. The new transformers were shipped fully loaded with pyranol. If they needed to be topped off, which sometimes happened, the railroad customers could buy, substitute pyranol depending on availability either from GE or from Monsanto. Relevant to this is the report of our historical expert, Mr. Hengemill, which is at docket 144-1, where he notes a number of times at Paoli and elsewhere that the railroads bought the pyranol directly from Monsanto, which was the manufacturer of the PCB component. I don't think there can be an inference here, and certainly APU never argued that GE's motive for wanting these releases to occur was so it could sell more pyranol. There was a case, I think it's out of the First Circuit, that involves GE. It did. I think explicitly regarded that pyranol as waste. Is that pyranol that it used in its own operations? It was. That came from the GE capacitor operation in Hudson Falls, New York, but the record there was very different. The record, which followed a trial, was that GE itself regarded the material as waste. It had no use for it. It sent it to this somewhat low-budget paint formulator, and it even continued sending the stuff to the formulator when the formulator stopped paying. And I should say that I'm not here to relitigate that case. GE did not agree with the trial court's findings of fact, but they are what they are. But on the facts as found, it was clearly waste. GE clearly had the intention to get rid of it, and the fact that it could get some money in return from the paint fabricator was not regarded as sufficient to overcome the conclusion that GE's predominant intent was to get rid of it. And I should add, GE's position is not any sort of per se rule. I mean, we recognize there can be cases of mixed motives where something has some utility and perhaps some value, but the real reason, or at least one of the reasons that the defendant transfers it to another party is to get rid of it and unburden itself from the disposal costs. But there's no evidence approaching that in this case. The Pyrenol was not only a useful but essential component of the transformers. The trains could not run without them. The railroads specified Pyrenol. For decades after a tunnel fire leading to New York, they could not allow mineral oil, which is the alternative, to be used in the transformers on locomotives or passenger rail cars. So the notion that GE wanted to get rid of this is really hard to credit. I mean, taking a step back, APU's theory would ask the court or ask a fact finder to believe that GE wanted to get rid of this useful and valuable material and to that end it made shoddy transformers and then sold them to the railroads and used the railroads as unwitting dupes to operate the transformers so they could release the Pyrenol at indeterminate times, at indeterminate places, in indeterminate quantities in various places along the Penn Central system. The operator theory. And what about GenCorp? GenCorp, I think, is very different. I know Chief Judge Sutton, you're very familiar with that case from having written the opinion. But there it was, if not strictly a joint venture, it was the moral and legal, for a circle of purposes, equivalent of a joint venture that GenCorp, the party on whom liability was sought to be imposed, GenCorp personnel helped find disposal locations because they were more familiar with the area than Olin was. GenCorp representatives sat on a joint committee that approved budgets for, among other things, waste disposal. I mean, those are inherently activities. If we put the legal form questions to the side or points to the side, you still have cooperation in GenCorp and wouldn't you describe this as cooperation here? But the test under Best Foods is not cooperation. It's not even control. It is control or management or direction over activities specifically having to do with pollution. Can it be only one entity or person? We acknowledge, I mean, the railroads obviously were operators in principle. One or more other entities could be operators. It's just that it ain't us in this case. There isn't a particle of evidence in the record that anything that the on-site GE employees did at the Paola yard for this period of time in the mid-70s when the cars were under warranty was directed to the disposal of pyranol. For instance, there's no evidence to the effect that they told the railroad workers, oh, don't worry, just dump the stuff over in the corner. Don't worry about the leaking transformer. It's good to go to take back to center city. There is none of that. And I should mention that I think it seems clear that under Rule 52 of the Federal Rules of Civil Procedure, the fact that the district judge ruled on written submissions does not change the fact that the standard of review is clear error. It's hard to see what else it could be. Why is it clear error if there are no fact disputes? There are fact disputes. Characterizations of the facts are in dispute. The question of whether someone is an operator is a legal question, isn't it? It's a mixed question of law and fact. Did GE exercise control over activities relating to pollution? That sounds like a fact question to me. Give me facts that you feel APU is pushing hard on and there was no clear error. I feel like you guys aren't really disagreeing about the facts. We disagree about the characterization of the facts. Materiality is the legal point. We disagree about whether GE's activities had anything to do with pollution. Our view, which we think is amply supported by the record, is that the GE employees there were to administer the warranty, to provide instruction, and to provide non-binding advice that the railroad was entirely free to disregard about troubleshooting myriad issues with the new rail cars, sometimes including the transformers. But Judge Watson said in his opinion, which admittedly was 30 pages long and not 300 pages long, he didn't mention every piece of evidence that was put before him, but I think he conscientiously evaluated the record and importantly, he explicitly noted that we have the evidence of Mr. Evans, who was the long-time Penn Central foreman at the Paoli yard, including during part of this relevant time, and the testimony of Mr. Keefe, who was in charge of the on-site cadre of GE employees for some period of time. And Judge Watson found that their testimony was basically in harmony and supported the finding of no operator liability. And another issue that my friend didn't mention is the essential requirement from the text of the statute that the exercise of control, management, or direction has to occur at the time of disposal. When were the PCBs disposed of? Not while GE was advising the workers about how to repair the transformers. It occurred while they were back and forth from Center City, Philadelphia, being entirely under the dominion of a railroad employee. We all know who runs the railroad. The railroad runs the railroad. GE did not run the railroad. It had no authority to take cars out of service. It had no authority to bind the railroad employees in anything they did. Very strict union work rules prohibited the GE employees from doing any hands-on work. And so we think the standard is clear error and that that's a steep hill for APU to climb. I'm curious, the operator, does it only apply to Paoli? Does it apply to the other three? Was there evidence in the record about GE employees on site at any of the other rail? It was incredibly fragmentary and Judge Watson alluded to and cited that evidence. The record was far more developed about the Paoli yard than at the other yards. There's no evidence really other than cryptic statements that yeah, I think GE had a trailer at Wilmington at some point. There was no evidence of what they did. Did it have anything to do with transformers? Did it have anything to do with pyranol leaks? It doesn't get anywhere near the level of evidence needed to show operator liability. I see my time is up. One final point, if the court has no questions, I'd like to make a concession, which is that the argument which the court need not reach in section 2A3 of our brief, which is the Hobart argument as to the Wilmington yard, that is clearly no longer tenable in light of the Supreme Court's decision in the Guam against United States case from a couple months ago. The settlement agreement that we cited between APU and the state of Delaware clearly released only Delaware state claims and under Guam that's not enough to trigger a circle of contribution claim. So if the court has no further questions. No, Your Honor. Thank you. I'd hate to interrupt you, but he really has a good point I'd forgotten about when you were up before, so on the operator side you have to show they're operating vis-a-vis the dispersal. At the time? Yeah, I mean that's a pretty important point. It is and I'm happy to address that, Your Honor. Again, what's required, these are fact intensive, it is mixed, it's mixed legal and fact, but there are a lot of facts, it's a big long record with a lot of deposition testimony and a lot of documents. But we tried to concisely address these issues in our briefs and this is one of the issues that we did address, which is that it's clear that the releases did happen at the time that GE was controlling the transformers. We have deposition testimony of GE employees saying we saw it, we did it, we tried to fix it, it was right in front of us. It's not that this happened at some other time in some other place. This happened at the rail yards during the period of time that GE was stationed there and was maintaining. Surely it would happen in other places, wouldn't it? Well, and in fact there were other releases that were elsewhere on the railroad, but the issue in this case is the cost that APU expended to clean up PCB contamination in the rail yards. So clearly there was. But the fact that it's happening everywhere suggests it's in spite of, not because of point. It's happening in spite of their being there, it's not because they're there that the dispersal happens. It's happening because it's part of the normal functioning operation of the transformer. Now they had control over the maintenance of the transformers and that's the key issue here. And they once again paint themselves as sort of arm's length advisors. But if I can just point to one little bit of testimony, this is GE's Lorne McMonagle and I think it's dispositive on this issue. The question was, this evaluation and determination of repairs was a primary responsibility of General Electric with respect to the transformers. Is that correct? Answer, yes. Question, it was also an ongoing primary responsibility of General Electric to determine the types of repairs needed for the transformers. Is that correct? Answer, yes. So clearly there was some split responsibility, but when it comes to the transformers and their maintenance and their repairs, one party had primacy and if railroad workers tried to get involved, they were threatened that their warranty would be voided. So again, if we were to really look at the facts of the record, it paints a very different picture than what GE portrays and then what the district court had determined. It's clear that GE maintained primary responsibility for the maintenance of the transformers at the time that they were leaking. Your Honors, I do see my time is up. I'm happy to yield the podium. The primary responsibility is the inquiry? With respect to operator liability? What I should say is primary control. I think we're good. Thanks to both of you for your very helpful briefs in this very complicated case and for your helpful oral arguments, above all, trying to answer our questions, which we always appreciate. So thank you very much. The case will be submitted and the clerk may call the next case.